**Darell Leroy SHECKLES, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 1084S379.

Supreme Court of Indiana.

Dec. 22, 1986.

Michael J. McDaniel, New Albany, for appellant.

Linley E. Pearson, Atty. Gen., Lee Cloyd, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Judge.

After a trial by jury, appellant Darell Leroy Sheckles was found guilty of felony-murder, criminal recklessness, and two counts of robbery resulting in serious bodily injury. The three latter offenses were merged into a judgment of conviction for felony-murder, Ind.Code § 35–42–1–1(2) (Burns 1979 Repl.). A prison sentence of sixty years was imposed by the court. Sheckles raises three issues in this direct appeal:

1. Whether the intent to collect a liquidated debt negates the criminal intent requisite for his felony-murder conviction;

2. Whether the evidence establishes that appellant abandoned the attempted robbery, and

3. Whether a proper chain of custody supported the admission of an exhibit of fragments recovered from the decedent's head.

Seven witnesses testified about the events which transpired on November 5, 1983. Two or three weeks earlier, Donnie Ellis had given his watch to Sheckles as security for a ten dollar loan. On November 5th, appellant approached Ellis outside Jesse's Bar, demanding repayment of the loan. When Ellis said he did not have the money, appellant threatened to kill him if he did not get it. Ellis felt an object which he believed to be a gun pointing at the middle of his back. Ellis told appellant that he worked part-time at the bar. Sheckles threw his arm around Ellis' neck and pulled him to a counter inside the bar, Ellis yelling, "He's going to kill me if I don't give him ten dollars." Appellant asked bartender Virginia Kane for ten dollars. She told appellant that she did not have the money and told him to leave. Sheckles told Kane that "somebody better pay me ten dollars or [I am] gonna kill Ellis."

Ellis pleaded for someone in the bar to give him the money. The decedent, Hershel Barnett, Jr., intervened in the argument. Ellis asked Barnett for the money, but Barnett refused, stating that Ellis should not have borrowed money which he could not repay. Barnett also told appellant that the watch should be worth at least ten dollars and asked him to continue the argument outside. Appellant released Ellis and began to back away toward the front door. As he backed away, Sheckles said, "F___ you Ginny, f___ everybody in here and f___ [someone else];" at this point, he pulled out a "cannon gun" and fired toward the bar. Kane reached for a gun behind the counter and returned fire. A gun battle ensued.

The autopsy report indicated that Barnett sustained a fatal gunshot wound to the head. Examination of the bullet fragments recovered from the decedent indicated that they were not fired from Kane's gun.

## I. Collection of a Debt

■ Appellant's felony-murder charge was based upon the underlying felony of attempted robbery.[1] Appellant argues that the State failed to prove that he was engaged in an attempted robbery when the decedent was shot and therefore the evidence is not sufficient to sustain the felony-murder conviction. He maintains that he was trying to collect a debt and did not intend to rob Ellis.

---

1. The offense of robbery is committed when a person "... knowingly or intentionally takes property from another person or from the presence of another person by using or threatening the use of force on any person or by putting any person in fear." Ind.Code § 35–42–5–1. (Burns 1979 Repl.). The robbery is attempted when the person, "... acting with the culpability required for commission of the crime ... engages in conduct that constitutes a substantial step toward commission of the crime." Ind.Code § 35–41–5–1 (Burns 1979 Repl.).

Interpreting a similar predecessor statute for robbery, this Court indicated that the person robbed did not have to be the actual owner of the property. *Jackson v. State* (1971), 257 Ind. 477, 275 N.E.2d 538. A robbery has been committed when property is taken from the person who is in lawful possession of it, such as one who is an agent for the owner. *Baker v. State* (1980), 273 Ind. 64, 402 N.E.2d 951.

Appellant cites *Cobbs v. State* (1981), 275 Ind. 393, 417 N.E.2d 310, to support his assertion that evidence that he was engaged in collecting a liquidated debt is a defense which negates the element of intent required to prove a robbery. In *Cobbs*, the defendant approached the victim on three occasions. During the first incident, Cobbs approached the victim at work. Cobbs, armed with a gun, demanded money from the victim, stating that he was merely collecting a prior debt. The victim complied. Six days later, Cobbs and a companion approached the victim at his house where Cobbs, armed, took money from the victim. This second incident was the basis of the conviction he appealed. Two days later, the pair returned to the victim's home but left the scene without taking any money before the police arrived.

Cobbs argued that the collection of an unpaid debt did not constitute the "unlawful taking" requisite for robbery. We held that Cobbs' taking of the money from the victim while armed was sufficient evidence and that the debt issue, upon which the parties disagreed, was a matter for the jury to resolve. Sheckles maintains that the following pronouncement by this Court was merely dictum and does not control resolution of the issue at bar: "More important, even if [the victim] had undisputedly owed Cobb this money, Cobb would not have been justified in taking the money by threatening to use force or by placing

[the victim] in fear; Cobbs' actions would still have constituted a robbery." *Cobbs*, 417 N.E.2d at 311.

Here, the debtor, Ellis, testified that he gave his watch to Sheckles as security for a loan. However, the law does not sanction the use of self-help with firearms as a debt collection device. It does not permit creditors to rely on violence, threats, or weapons to collect debts; they should seek redress through the appropriate legal and peaceful channels.[2] Indeed, in writing the criminal code, the legislature has defined property to include property in the possession of the victim and in which the accused has an interest.[3] We now hold that a creditor's attempt to collect by force a secured loan does not negate the criminal intent element of robbery.

## II. Defense of Abandonment

Appellant argues that the evidence indicates that he abandoned the attempted robbery prior to the shooting which took the life of the decedent. Therefore, he should be absolved of criminal liability for the attempted robbery.

Abandonment relieves an accused of criminal responsibility when "a criminal enterprise is cut short by a change of heart, desertion of criminal purpose, change of behavior, and rising revulsion for the harm intended." *Pyle v. State* (1985), Ind., 476 N.E.2d 124, 126; *see also, Land v. State* (1984), Ind., 470 N.E.2d 697.

One who asserts this defense must establish that he voluntarily abandoned his effort to commit the crime and voluntarily prevented commission of the crime. Ind. Code § 35–41–3–10 (Burns 1979 Repl.). He must have renunciated the criminal plan prior to the completion of the crime or before it became inevitable. *Harrison v.*

---

2. This policy is reflected in our Uniform Commercial Code. "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process *if this can be done without breach of the peace* or may proceed by action." Ind.Code § 26–1–9–503 (Burns 1975) (emphasis added).

3. Property is that of another person "if the other person has a possessory or proprietary interest it it, even if an accused person also has an interest in that property." Ind.Code § 35–41–1–2 (Burns 1979 Repl.).

*State* (1978), 269 Ind. 677, 382 N.E.2d 920, *cert. denied,* 441 U.S. 912, 99 S.Ct. 2010, 60 L.Ed2d 384 (1979). The accused must have actually engaged in the prohibited conduct, that is, taken a substantial step toward the attempted crime.[4] The conduct constituting abandonment must occur after commencement of the substantial step, *Woodford v. State* (1986), Ind., 488 N.E.2d 1121, but prior to completion of the attempted crime.

Deterrence and absence of dangerous conduct are the rationales underlying the defense of abandonment. Deterrence is achieved because perpetrators have an opportunity to avoid criminal liability by abandoning an inchoate offense. Abandonment would thus increase the likelihood of avoiding the substantive harm of the attempted crime. 1 P. Robinson, *Criminal Law Defenses* § 81(a) (1984); Model Penal Code § 5.01, comment 8 (1985).

Renunciation of criminal purpose also tends to negate dangerousness. Society seeks to punish persons with culpable state of minds who have demonstrated their dangerousness. 1 P. Robinson, § 81(a) *supra.* When the actor demonstrates renunciation of criminal purpose, criminal liability should not be imposed.

■ Consideration of these policies, in combination with the elements of the offense, indicates that abandonment does not constitute a defense to a felony-murder charge when death occurs during the attempted commission of a felony. The elements of felony-murder are the killing of another human being while committing or attempting to commit the underlying felony. *Miller v. State* (1983), Ind., 448 N.E.2d 293. In the case at bar, the State had the burden to prove that Sheckles:

(1) killed another human being

(2) while taking a substantial step toward

(3) the knowing or intentional

(4) taking of property from another person

(5) by using or threatening the use of force, or by putting any person in fear. Ind.Code §§ 35–41–5–1; 35–42–1–1(2); 35–42–5–1.

Felony-murder is designed to protect society from the substantive harm of death and the harm attributed to the underlying felony charged, here attempted robbery. Indiana requires that the abandonment occur after conduct evidencing a substantial step but before the substantive harm occurs or becomes inevitable. Interpretation of the statutory phrase, "while committing or attempting to commit" indicates that a legal abandonment cannot occur when a person has been killed during the commission of the underlying felony in felony-murder.

We have recently indicated that the phrase in the felony-murder statute, "while committing," connotes that the homicide and felony must be committed during one continuous transaction. A transaction is continuous when the commission of both the homicide and felony are closely connected in time, place, and continuity of action. *Eddy v. State* (1986), Ind., 496 N.E.2d 24. A homicide occurs "while committing" the accompanying felony when the perpetrator shoots the homicide victim while leaving the felony scene. *Averhart v. State* (1984), Ind., 470 N.E.2d 666.

The application of abandonment to felony-murder would produce results antithetical to the reasons underlying the defense and would be contrary to the purpose of the felony-murder rule. In the case at bar, the substantive harm sought to be protected by the proscription of robbery was avoided because appellant did not complete the robbery. Obviously, the primary substantive harm attributed to felony-murder was not similarly avoided. As this Court said in *Moynihan v. State* (1880), 70 Ind. 126:

The perpetration of, or the attempt to perpetrate ... [the underlying felony] ... involves great moral depravity and an utter disregard of the rights of person

---

**4.** Abandonment may be asserted as a defense only to attempt, conspiracy, and aiding, inducing or causing an offense. Ind.Code § 35–41–3–10 (Burns 1979 Repl.).

and property; and the Legislature, for the protection of society and for wise ends, have thought it necessary to make the taking of life in the perpetration of, or the attempt to perpetrate, ... murder in the first degree, without any reference to any intent to commit the homicide. The party who perpetrates, or attempts to perpetrate, either of those offences, intends a great wrong in the commission of the offence, and if death ensue he must take the consequences which result.

*Moynihan,* 70 Ind. at 130.

While Sheckles did not complete the robbery, he did commit the offense of felony-murder: he killed someone while attempting a robbery. The attempted robbery was but an element of the proof for felony-murder and the State proved that element. To absolve an accused of criminal liability for felony-murder where he "abandoned" an element of the offense while committing the substantive harm sought to be prevented by statute would be an egregious affront to society. Accordingly, we hold that abandonment does not constitute a defense to a charge of felony-murder predicated upon an attempted robbery.

### III.   Chain of Custody

Appellant argues that a proper chain of custody did not precede the admission into evidence of State's exhibit 3 which was comprised of bullet fragments recovered from the decedent's head. He maintains that a material variance existed between the weight of these fragments when weighed by the police detective who had custody of the evidence and when weighed later by the ballistics examiner. He alleges that this material variance suggests the possibility that someone tampered with the evidence.

Three bullet fragments were recovered during the autopsy and given to Detective Rick Sowders, who placed them in a .35 mm film canister. Sowders testified that the three fragments weighed, at receipt, 8 grams, or approximately 123.44 grains. The canister was placed in a paper bag which was sealed with staples and brown tape; the edges of the tape were initialed by Sowders. Sowders wrote the case number, item number, and his signature on the paper bag. The evidence was locked in the property room of the police department until Sowders delivered the sealed container to William Kuhn, the ballistics examiner. Upon receipt of the evidence, Kuhn removed the fragments from the canister to physically inspect them and measured the weight of the fragments at 98.5 grains. Sowders identified the fragments in court by their unusual shape and number as the same fragments that were in his possession until he relinquished them to Kuhn. Kuhn testified that Exhibit 3 contained the same fragments he received from Sowders because he had etched the case number, item number, and his signature onto the fragments.

Chain of custody is a method whereby the continuous whereabouts of an item of evidence, from the moment the police collect the item until it is offered into evidence at trial, is established by the proponent. The proponent must show a complete chain of possession from the original receiver to the final custodian. *Mendez v. State* (1977), 267 Ind. 309, 370 N.E.2d 323. The purpose is to prove the identity and integrity of the item, thereby negating any substantial likelihood of substitution or alteration of the evidence, *Johnson v. State* (1977), 267 Ind. 415, 370 N.E.2d 892, and establishing a proper foundation which connects the evidence with the accused. *Mendez,* 267 Ind. 415, 370 N.E.2d 323.

The establishment of a chain of custody is necessary where the nature of the evidence lacks identifiable characteristics or where the evidentiary purpose to be served by the item requires assurance that the evidence has not been subjected to tampering which could not be detected by human perception. However, the State does not have to exclude all possibilities of tampering but need only provide reasonable assurance that the exhibit has passed through the various hands in an undisturbed condition. *Moten v. State* (1978), 269 Ind. 309, 380 N.E.2d 544.

A proper chain of custody has been established when an officer receives possession of a bullet during the autopsy and delivers it to another custodial agent who marks the bullet and identifies it at trial as being in substantially the same condition. *Lloyd v. State* (1983), 448 N.E.2d 1062; *see also, Wilson v. State* (1975), 263 Ind. 469, 333 N.E.2d 755. In the case at bar, the care with which the fragments were marked and transmitted before trial was quite adequate. While there was a variance of 24.94 grains in the weight of the fragments, as measured by the officer and the ballistics examiner, the chain of custody established at trial provides reasonable assurance that the integrity of the fragments was not affected by substitution or alteration of the evidence.

The judgment of the trial court is affirmed.

GIVAN, C.J., DeBRULER, PIVARNIK and DICKSON, JJ., concur.